IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VERONIQUE TREMBLAY, Individually and as Representative of the Estate of Jean-Francois Alain, and as Next Friend of E.A., a minor and wrongful death beneficiary; LOUIS-PHILLIPPE ALAIN, and JEAN ALAIN<br><br>VS.<br><br>THE IRONMAN GROUP and WORLD TRIATHLON CORPORATION | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. NO. 4:26-cv-02473 |

## PLAINTIFFS' ORIGINAL VERIFIED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COME NOW Plaintiffs Veronique Tremblay, Individually and as Representative of the Estate of Jean-Francois Alain, and as Next Friend of E.A., a minor and wrongful death beneficiary; Louis-Phillipe Alain, as wrongful death beneficiary of Jean-Francois Alain; and Jean Alain as wrongful death beneficiary of Jean-Francois Alain (collectively "Plaintiffs"), complaining of The Ironman Group and World Triathlon Corporation (collectively "Defendants"), and, for cause of action, would respectfully show unto this Honorable Court the following:

### I. PARTIES

1.1    Plaintiff Veronique Tremblay, Individually and on behalf of the Estate of Jean-Francois Alain is a resident of Sainte-Julie, Quebec, Canada. Veronique Tremblay is the surviving spouse of Jean-Francois Alain.

1.2     Plaintiff E.A. through his mother, Veronique Tremblay, is the minor child of the deceased, Jean Francois Alain, and wrongful death beneficiary of the estate and is a resident of Saine-Julie, Quebec, Canada.

1.3     Louis Phillipe Alain, as wrongful death beneficiary of Jean-Francois Alain is a resident of Sainte-Julie, Quebec, Canada. Louis Philipe Alain is a surviving adult son of Jean-Francois Alain.

1.4     Jean Alain, as wrongful death beneficiary of Jean-Francois Alain is a resident of Plessisville, Quebec, Canada. Jean Alain is the surviving father of Jean-Francois Alain.

1.5     Prior to his death, Jean-Francois Alain was a resident of Sainte-Julie, Quebec, Canada. A probate proceeding is open and pending in a court in Quebec, Canada.

1.6     Defendant The Ironman Group ("Ironman"), is a foreign corporation with its principal place of business in Tampa, Florida, doing business in the State of Texas for the purpose of accumulating monetary profit, but does not maintain a regular place of business nor a designated agent for service of process in the State of Texas.  It can be served by serving the Secretary of State of Texas at 1019 Brazos Street, Austin, Texas 78701, as Defendant's agent for service, because Defendant does not maintain a regular place of business in Texas or a designated agent for service of process, and this suit arose from  Defendant's business in Texas. Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045, the Secretary of State is requested to forward a copy of this Petition, along with Citation, by forwarding same by registered mail, return receipt requested, to Defendant The Ironman Group, at its home office at 3407 W. MLK Blvd, Tampa, Florida 33608.

1.7     Defendant World Triathlon Corporation, is a foreign corporation with its principal place of business in Tampa, Florida, doing business in the State of Texas for the purpose of

2

accumulating monetary profit, but does not maintain a regular place of business nor a designated agent for service of process in the State of Texas. On information and belief given the lack of properly filed governing documents in any jurisdiction, this entity conducts business in the State of Texas under the assumed name of The Ironman Group. It can be served by serving the Secretary of State of Texas at 1019 Brazos Street, Austin, Texas 78701, as Defendant's agent for service, because Defendant does not maintain a regular place of business in Texas or a designated agent for service of process, and this suit arose from Defendant's business in Texas. Pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045, the Secretary of State is requested to forward a copy of this Petition, along with Citation, by forwarding same by registered mail, return receipt requested, to Defendant World Triathlon Corporation, at its home office at 3407 W. MLK Blvd, Tampa, Florida 33608.

## II.  JURISDICTION

2.1      The Court has jurisdiction over the lawsuit under 28 U.S.C. §1333 because the suit involves admiralty and maritime jurisdiction. This case is brought pursuant to 28 U.S.C. § 1333, the general maritime law, and Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims & Certain Asset Forfeiture Actions of the Federal Rules of Civil Procedure.

2.2      This Court has jurisdiction over the Defendants based on their intentional, continuous and substantial contacts with Texas, and the presence in this District of property owned by and/or owed to Defendant.

## III.  VENUE

3.1      Venue is proper in this matter pursuant to the admiralty and maritime laws of the United States, Rule 82 Fed. R. Civ. P.

3

## IV.  FACTS AND NEGLIGENCE OF DEFENDANTS[1]

4.1     This case arises out of the injuries and ultimate death suffered by Jean Francois Alain during the swimming portion of the Ironman 70.3 Texas event held on April 7, 2024, in Galveston, Texas. He died on April 8, 2024, following injury sustained in the swim portion of the race which was an "open water" swim in Offatts Bayou adjacent to Galveston Bay. The cause of death was anoxic brain injury caused by drowning. He drowned due to the negligence and gross negligence of Defendants.

4.2     A triathlon is an endurance race which combines a three-sport course including swimming, cycling, and running. The first triathlon was held in San Diego in 1974 with 46 total competitors. The first "Ironman" competition was organized by the World Triathlon Corporation in Hawaii in 1978. The competition has grown in popularity since inception and Defendants manage races all over the world. Defendants market to these athletes an ability to race in a "mass participation" event that "test the limits of human physical and mental strength."

4.3     Defendants' boast that their race structure tests human biological limits mandates a legal obligation and duty to each participant to develop a race plan that includes necessary emergency response that is built to timely deliver life-saving measures when needed. This is particularly necessary due to participant vulnerability in the open water swim where the "limits of human physical and mental strength" are most heavily implicated. The Ironman Texas 70.3 race's

---

[1] Plaintiffs provide the underlying facts of the horrific death of Decedent, as well as the associated negligent and grossly negligent conduct of the Defendants to provide context and background for the requested Rule B seizure of any and all assets of the Defendants within the Southern District of Texas.  However, the claims for negligence and gross negligence against the Defendants will be asserted in a different lawsuit as a result of a forum selection clause between the parties.

site plan and training program(s) failed miserably to protect the participants due to the collective negligence and gross negligence of the Defendants.

4.4    The swimming portion of a triathlon varies by race type: a sprint triathlon includes a 0.5 mile swim, an Olympic triathlon includes a 1.0 mile swim, the 70.3 / half Ironman is a 1.2 mile swim, and a full Ironman includes a 2.4 mile swim. The swimming venue is "open water" and usually involves a lake, reservoir, river, or ocean. The Ironman Texas 70.3 swimming venue is Offats Bayou which flows from Galveston Bay. A triathlon's swim portion is notorious for causing the most participant deaths in races managed by Defendants.

4.5    In 2012, USAT reviewed 43 cases of adult deaths in their sanctioned events from 2003-2011. USAT determined that 79% of the deaths occurred during the swim segment. Interestingly, there was no connection between the fatality rate and the length of the race. According to USAT, "[t]here is no obvious silver-bullet solution to decreasing the drowning rate during open water triathlons based on available data." USAT blamed cardiac conditions even though they did not have access to detailed autopsy information. Nevertheless, USAT suggested, "[t]he key to success is to attack the issue on a broad front, adopting a shot of strategies that, together, might reasonably be expected to prove helpful." No strategies were disclosed in USAT's 2012 report, and participant safety has not improved in the decade since Defendants have known of the increased risk to participant safety.

4.6    The percentage of deaths has grown since the races were first commissioned by Defendants. From 2011-2019 there was a 50% increase in deaths from the prior eight- year window from 2003-2011. In 2019 alone, there were 15 reported drownings during triathlons including Ironman 70.3 events. Defendants are aware of the trends in fatalities and know the importance of

providing appropriate aquatic safety measures including professional, knowledgeable and well-trained lifeguards and emergency services. Defendants failed decedent in that measure for this race. In essence, Defendants cash the checks for hundreds of thousands of participants a year, including those received from local sponsors, and have made no historical race improvements in the face of known dangers.

4.7     Within the open water triathlon environment, unique challenges are presented including visibility, temperature, optical challenges and currents. This makes lifeguarding an open water triathlon significantly different than lifeguarding other swimming venues due to the high stakes and uncertain environment. The sheer number of racers creates a dense vein of participation near the buoys which causes swimmers to kick and hit each other (unintentionally) and swim over each other to gain an advantage. In open water swims, triathletes must alter their head position during each stroke to view their direction all while fighting their way to maintain positioning in a crowded bottleneck against the buoy marker line. It is calamity unlike a typical beach patrol lifeguard's usual engagement. Spotting swimmers in distress in this race structure requires extensive training. Defendants failed to so train.

4.8     The unique setting of an open water swim with a congested stream of participants strains the human ability to timely recognize drowning events and creates a delayed reaction to allow life-saving measures to be deployed. "Scanning" is a vital part of lifeguarding and the ability to "scan" at this race (and others held by Defendants) is comprised by the set-up and nature of the short interval staggered swim start. Scanning requires the lifeguard to surveil a dedicated area for signal detection which requires observation of swimmer behavior and signal recognition. Proper scanning requires each swimmer to be accounted for, which becomes impossible during the aggressive

physical contact of an open water swim unless appropriate training and appropriate numbers of guards are deployed. Additionally, offset overhead high resolution video / surveillance drone usage should also be used that could comply with governing FAA rules.

4.9     Open water triathlons make drowning identification more challenging which requires additional training and increased numbers of guards along the swim route. Being trained on how to identify "splashing" or "frequent submersion" or "lack of progress in the water" are insufficient training metrics because triathlon swim component incorporates all of them. Misinterpretation or outright missing swimmers is the result of improper training and a lack of suitable numbers of guards on the swim route. Again, offset overhead high resolution video / surveillance drone usage should also be used.

4.10     The event was staffed with underage "rookie" lifeguards who have not had any training and/or insufficient training on guarding an open water mass participant swim. The first response to Jean-Francois Alain was from a "rookie" minor child who was unfortunately tasked by Defendants with the impossible burdens of guarding the lives of nearly two-thousand participants in this open water swim. He was not prepared for the challenge. Defendants set him up to fail.

4.11     The event was staffed with lifeguards who were incapable of competently operating emergency rescue equipment. Jean-Francois's struggles in the water were not timely identified and this cost valuable seconds and minutes to stave off oxygen deprivation, which ultimately caused his death.

4.12     Once Jean-Francois was finally loaded on a rescue boat, the boat was not equipped with an emergency oxygen source. The boat also became disabled due to operator error or by equipment failure which caused additional delays - in a lifesaving situation where every second can

be the difference between living and dying. Defendants' personnel could not get him to shore in a timely and expected fashion which ultimately caused and/or contributed to his death.

4.13    The boat operator summoned a jet ski to transfer Jean-Francois to shore via a towed portable stretcher. Getting Jean-Francois to shore as fast as possible was the only chance to avoid certain death. Defendants' guards failed - yet again - and the operator of the jet ski lost control of the jet ski and Jean-Francois flew back into the water requiring a third retrieval. In a lifesaving situation where every second can be the difference in living and dying, Jean-Francois was failed once again by Defendants.

4.14    A second jet ski arrived and packaged Jean-Francois for transfer to shore. Once he arrived, there was no EMS/Ambulance present. He had to wait on additional medical support - most notably oxygen transfer and fluid flushing. By now, Jean-Francois was in critical oxygen deprivation because Defendants failed in their obligation for a timely removal from the water.

4.15    Defendants should have had an ambulance parked at the dock adjacent to the floating medical triage tent since they all know that most emergency medical needs are during the swim portion of the event as it is the most significant test "of the limit of human physical and mental potential." But an ambulance was not present near the medical triage tent but was Located on the other side of the Bay - minutes away from the dedicated medical area where urgency is required.  As Jean-Francois Alain was drowning, eyewitnesses report that the "hype man" announcer to welcome participants at the start of the swim race adjacent to the medical triage tent crudely announced a joke that if they "get in trouble, to just swim towards the ambulance," which was perched across the bay at the swim termination.

4.16    Remarkably, the dedicated ambulance lacked suitable emergency staff and additional manpower was required to be added in route in a Whataburger parking lot on the way to UTMB hospital. The EMS literally had to stop at a fast-food restaurant to add competent personnel while Jean-Francois's chance at surviving Defendants' negligence was slipping away. In a life-saving situation where every second can be the difference in living and dying, Jean-Francois was failed once again by Defendants.

4.17    What is most egregious is the entire lifeguard platoon from the Galveston Beach Patrol / Park Board that was selected by Defendants as the front-line emergency services personnel failed to properly identify Jean-Francois Alain's medical event as a drowning. It is incredible that the people charged to monitor drowning could not identify it when they saw it, right in front of them, in the open water they are charged with patrolling.

4.18    Thousands of Harris County residents participate in the Ironman 70.3 Texas (Galveston Bay) in April every year and the full Ironman Texas (Lake Woodlands) in May every year. The Ironman Texas is sponsored by Memorial Hermann hospital and is a North American championship. Defendants' failures affect the lives and families of thousands of Houstonians and the neighboring counties. Every year, someone who jumps in the water at the Houston-area events risks a certain death until and unless Defendants change their race.

4.19    Defendants are negligent for failing to create safety systems and response measures to protect race participants. Jean Francois Alain died because of these collective failures. The injuries and death suffered by Jean Francois Alain were caused by the negligence and/or gross negligence of Defendants., in the following particulars, among others:

a.    Failing to have an appropriate water rescue plan;

b.      Failing to organize and conduct the swim competition in a reasonably safe manner;

c.      Failing to properly train or verify training, qualification, and experience of all water rescue personnel;

d.      Failing to distinguish between the risks of usual and customary aquatic venues and an open water swim;

e.      Failing to develop surveillance protocols for lifeguards, spotters, boat personnel;

f.      Failing to have EMS personnel in or near the water at all times during the swim portion of the race who are trained and equipped with all necessary life-preserving equipment including to oxygen administration, positive pressure ventilation equipment, airway management equipment, and an AED;

g.      Failing to position emergency services and response personnel in appropriate locations;

h.      Failing to have personnel attend emergency action training sessions prior to commission and before the race started;

i.      Failing to have personnel attend safety orientations dedicated to the risks of open water swim venues;

j.      Failing to allow a pre-race swim and warm-up;

k.      Failing to provide suitably trained lifeguards and emergency personnel;

l.      Failing to have sufficient number of suitably trained lifeguards and emergency personnel;

m.      Failing to property train lifeguards and emergency personnel on the use of safety equipment;

n.      Failing to have proper safety equipment and emergency life preserving medical equipment on site near the risks known to Defendants;

o.      Failing to property identify and train a swim captain;

p.      Failing to properly identify and train a boat captain;

q.      Failing to have a fire boat or rescue boat from Galveston, Houston, or neighboring communities with competent personnel and necessary medical equipment including

10

but not limited to oxygen administration, positive pressure ventilation equipment, airway management equipment, and an AED;

r.    Failing to have a suitable number of on-course guards to properly assess and scan for distress in a congested race atmosphere;

s.    Failing to have an appropriate "Swim Course Safety Plan," or similar;

t.    Failing to have an appropriate "Medical Safety Plan," or similar;

u.    Failure to have appropriate trained professionals and suitable life saving medical equipment at the medical triage tent;

v.    Failing to train all elements to all personnel of the Starfish plan, or similar;

w.    Failure to have all marine equipment as specified by the Starfish plan, or similar;

x.    Failing to warn participants of the lack of trained guards and lack of suitable safety and emergency medical equipment;

y.    Failing to warn participants that "rookie" guards would be responsible for life-saving measures;

z.    Failing to warn participants that on-site EMS was not on-site and what was available nearby failed to include appropriate trained professionals which required additional manpower;

aa.    Failing to conduct proper pre-race meetings / rehearsals to mitigate risks;

bb.    Failing to have a race specific boat plan that properly addressed the uniqueness of this race;

cc.    Failing to recruit qualified emergency services personnel;

dd.    Negligent hiring, supervision, and training of race personnel;

ee.    Failing to have offset overhead drone surveillance of the swim participants to identify struggling swimmers in time to react to the hazard; and

ff.    Other acts of negligence and/or omissions to be shown at trial herein.

4.20    All of the above acts and/or omissions, individually, or in combination, were a direct and proximate cause of the death of Jean-Francois Alain and Claimants' damages.  Claimants seek all damages entitled to them by law.

4.21    Defendants are legally responsible to Claimants for the negligent conduct of their respective vice-principals, and the negligent conduct of their respective employees, agents, servants, and representatives under the theory of respondeat superior, agency, and other non-delegable duties. Defendants are vicariously liable for all negligence of their respective employees, agents, servants, and representatives.

## V.  DAMAGES

5.1    As a result of Defendants' acts and omissions, Veronique Tremblay lost her husband. E.A. and Louis Phillipe Alain have lost their father.  Jean Alain has lost his son. All have suffered and sustained significant damages. The Decedent suffered unspeakable fear, terror, and pain–then lost his life–resulting in lost wages and future wage earning capacity. The amount of monetary relief sought is within the sole discretion of the trier of fact, who will consider the evidence and decide what amount will compensate Plaintiffs for Defendants' acts and omissions. Plaintiffs seek all damages allowed by law for wrongful death and the estate's survival actions.

5.2    Defendants proximately caused injury and death to Jean-Francois Alain, which resulted in the following damages, among others, to the Estate of Jean-Francois Alain: (a) physical pain in the past; (b) mental anguish in the past; (c) disfigurement in the past; (d) physical impairment in the past; (e) medical expenses in the past; (f) loss of earnings and loss of future earning capacity; (g) burial expenses; and (h) exemplary and punitive damages.

5.3    Defendants proximately caused injury and death to Jean-Francois Alain, which resulted in the following damages, among others, to Plaintiffs: (a) loss of companionship and guidance in the past and future; (b) mental anguish in the past and future; (c) loss of earning capacity in the past and future; (d) loss of love, affection, care, attention, and consortium in the past and future; (e) loss of household services in the past and future; and (f) exemplary and punitive damages.

5.4    Plaintiffs are entitled to exemplary damages to punish Defendants for their grossly negligent actions, and to deter future similar conduct.

5.5    Plaintiffs seek all damages allowed by law.

5.6    Plaintiffs seek monetary relief over $20,000,000.

## VI.  RULE B ALLEGATIONS

6.1    Plaintiffs are informed and believe that none of the officers of Defendants are now within the Southern District of Texas, that Defendants do not maintain an office within this District, that Defendants are not incorporated or formed in, the State of Texas, that Defendants do not have an agent for service of process in this District, and that Defendants cannot be found within this District for purposes of Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims & Asset Forfeiture of the Federal Rules of Civil Procedure.

6.2    Plaintiffs are informed and believes that Defendants do now, or will during the pendency of this action, have, certain goods and chattels, or credits and effects within the Southern District of Texas.

6.3    Plaintiffs seek an order of attachment or garnishment from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil

Procedure, attaching any assets of Defendants, including sponsorship funds owed to the Defendants, for the purpose of securing jurisdiction over Defendants, and to secure Plaintiffs' claims as described above.

WHEREFORE, Plaintiffs pray:

a. That process in due form of law according to the practice of this Honorable Court issue against Defendants summoning them to appear and answer, all and singular, the matters aforesaid;

b. That process of maritime attachment and garnishment issue to attach and seize Defendants' tangible or intangible personal property, goods, chattels, credits and effects, including, but not limited to property held by others owed to Defendants– up to the amount sued for – in the hands of garnishees named in the process;

c. That as soon as practicable following the attachment and/or seizure of the things identified herein, a further hearing be held by this Court pursuant to Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure;

d. That a judgment may be entered in favor of Plaintiffs against Defendants for the amount of his claim up to $20,000,000, and that a decree of condemnation issue against the property of Defendants; and

e. That Plaintiffs may have such other and further relief as plead herein, and which this Court and justice may deem just and appropriate under the circumstances of the cause, and all other and further relief to which he may be entitled, in law or in equity.

Respectfully submitted,

*/s/ Marcus R. Spagnoletti*
Marcus R. Spagnoletti
SBN 24076708 / SDTX ID 1139600
mspagnoletti@spaglaw.com
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Telephone:    713-653-5600
Facsimile:    713-653-5656

**OF COUNSEL**:

SPAGNOLETTI LAW FIRM
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Telephone: 713-653-5600
Facsimile: 713-653-5656

and

MOYE LAW FIRM
William R. Moye
SBN 24027553
will@moyefirm.com
2200 Post Oak, Blvd. Suite 1000
Houston, Texas 77056
Telephone: 713-333-8206

**ATTORNEYS FOR PLAINTIFF**